IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,         ) | |
| )  | |
| Plaintiff,          ) | Civil No. 3:25-cv-00133 |
| )  | |
| v.          ) | |
| )  | |
| APPROXIMATELY $24,488 IN U.S.   ) | VERIFIED COMPLAINT FOR |
| CURRENCY AND A GOLD         ) | FORFEITURE IN REM |
| NECKLACE AND PENDANT,        ) | |
| )  | |
| Defendants.          ) | |

Plaintiff, United States of America, hereby files and serves this VERIFIED COMPLAINT IN REM and alleges as follows:

## I.   NATURE OF THE ACTION

1. This is an action to forfeit and condemn specific property (hereinafter the "Defendant Property") to the use and benefit of the United States of America (hereinafter "Plaintiff") for its involvement, as set forth below, in violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846.

2. The Defendant Property is believed to be forfeitable under 21 U.S.C. § 881(a)(6) as money or a thing of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and/or money used or intended to be used to facilitate one or more federal controlled substance offenses.

## II. DEFENDANT IN REM

3. The Defendant Property is generally described as:

   a. approximately $24,488 in U.S. currency seized on October 25, 2022, from the residence of Roberto Esquivias-Sandoval (hereinafter "ESQUIVIAS-SANDOVAL") in Rockford, Illinois; and

   b. a gold necklace and pendant[1] seized on October 25, 2022, from ESQUIVIAS-SANDOVAL in Davenport, Iowa.

4. ESQUIVAS-SANDOVAL is also known by the aliases Luis Manuel Zamora Briseno and Pedro Esquivias.

5. The Defendant Property is in the custody of the United States.

## III. JURISDICTION AND VENUE

6. The Court has jurisdiction over this civil case commenced by Plaintiff under 28 U.S.C. § 1345 and over this action for forfeiture under 28 U.S.C. § 1355(a).

7. The Court has in rem jurisdiction and venue over the Defendant Property under 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district, and under §§ 1355(b)(1)(B) and 1395(b)–(c) because the jewelry was brought into and found in this district.

## IV. APPLICABLE STATUTES

8. The "Controlled Substances Act" was enacted by Congress as Title II of the "Comprehensive Drug Abuse Prevention and Control Act of 1970," Pub. L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801–904).

---

[1] This jewelry is more specifically described as a yellow gold, 20-inch, 3.74 mm chain and a yellow gold medal with the letters "RMR" on a diamond-cut backing plate.

9. The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

10. Schedule II substances have a high potential for abuse and have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions, but use may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2)(A)–(C).

11. Cocaine, fentanyl, and methamphetamine are Schedule II controlled substances. 21 C.F.R. § 1308.12(b)(4), (c)(9), (d)(2) (2025).

12. Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute, a controlled substance, unless authorized by law to do so. 21 U.S.C. § 841(a)(1).

13. Only persons registered by the Attorney General of the United States, in accordance with rules and regulations promulgated by the Attorney General, may legally manufacture or distribute controlled substances. 21 U.S.C. § 822(a)–(b).

14. Under the Controlled Substances Act, it is unlawful to conspire with others to violate its prohibitions. 21 U.S.C. § 846.

15. Under the Controlled Substances Act, it is unlawful for a person to knowingly or intentionally use a communication facility, including the U.S. Mail and telephone, to facilitate the commission of a felony drug offense. 21 U.S.C. § 843(b). Each separate use of a communications facility is a separate offense.

16. Under the Controlled Substances Act, all moneys or things of value furnished or intended to be furnished in an illegal exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate a violation of the Controlled Substances Act are subject to forfeiture, and no property right shall exist in such property. 21 U.S.C. § 881(a)(6).

## V.   FACTS

### A.   Known Characteristics of Drug Traffickers

17. Law enforcement officers know, based on their training, professional education, and experience, the following facts about drug traffickers and their methods of operation:

   a. Drug traffickers often keep the controlled substances they are dealing in their physical possession or under their constructive control in strategic locations they deem safe from detection or theft, including, but not limited to, residences, garages, storage units, outbuildings, and other structures or vehicles.

   b. Drug trafficking is predominately a cash business, because those in the trade seek to prevent financial institutions and law enforcement from becoming suspicious of their activities if they would regularly deposit and/or withdraw large amounts of cash into legitimate accounts.

   c. Drug traffickers commonly use digital scales to weigh the drugs they are distributing and package the drugs for sale using materials such as plastic bags, plastic wrap, and vacuum sealers, which they keep at their residence or other locations where they store, package, or distribute drugs.

   d. Drug traffickers usually have a cover story to tell law enforcement when they are caught with drug money to attempt to provide a seemingly legitimate reason for them to have an atypical amount of cash in their possession.

  e. Relatively large amounts of cash found with or near distribution quantities of controlled substances, or in or near locations involved in drug trafficking usually constitute drug proceeds.

  f. It is common for drug traffickers to separate their proceeds by denomination and put the currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

### B. Evidence of the Conspiracy and Initial Seizure

18. In September of 2021, the Federal Bureau of Investigation (hereinafter the "FBI") in the Quad Cities area[2] was in contact with United States Postal Inspection Service (hereinafter the "USPIS") in Phoenix, Arizona to coordinate their investigative work concerning a suspicious package that had been seized.

19. On August 19, 2021, the USPIS identified two suspicious parcels being sent via U.S. Priority Express mail, including one addressed to an address in Moline, Illinois.

20. A properly trained drug detection dog alerted to the scent of narcotics on the parcels.

21. A search warrant was obtained in the District of Arizona for the parcels and executed.

22. The parcel addressed to Moline, Illinois was found to contain a peanut butter container containing a clear plastic package wrapped in black electric tape. Inside the clear plastic package was approximately 104.5 grams of M-30 fentanyl pills.

---

[2] The "Quad Cities" are Davenport, and Bettendorf, Iowa, and Rock Island and Moline, Illinois.

23. Additional investigation by USPIS revealed numerous inquiries tracking the parcel came from cities in Mexico, which is a drug source country.

24. Additionally, there were internet protocol (IP) addresses used to track the parcel located in New Jersey and Rockford and Chicago in Illinois.

25. One of the IP addresses tracking the package was registered to Axel ESCAMILLA (hereinafter "ESCAMILLA") in Rockford, Illinois.

26. Investigators discovered that an associate of ESCAMILLA, "JPD", lived at the Moline residence the suspicious package was addressed to.

27. Law enforcement lawfully placed a GPS tracker on JPD's vehicle to track his movements, which revealed JPD traveled all over Davenport, Iowa and to ESCAMILLA's residence in Rockford.

28. A check of past activities at JPD's address in Moline, Illinois revealed that three packages, including the one seized by the USPIS in Arizona, had been delivered to the address between August 2021 and January 2022, which had all been tracked by Mexican IP addresses.

29. An FBI Special Agent conducted additional investigation and discovered an active investigation by the Quad Cities Metropolitan Enforcement Group (QCMEG) involving ESCAMILLA as well as ESQUIVIAS-SANDOVAL.

30. Specifically, in the fall of 2021, an undercover QCMEG agent had purchased sixty grams of cocaine for $3,000 from ESQUIVIAS-SANDOVAL in Silvis, Illinois, which had been negotiated by ESCAMILLA.

### C.  ESQUIVIAS-SANDOVAL's Criminal History Prior to 2023.

31. ESQUIVIAS-SANDOVAL was charged in approximately 1998 with possession with the intent to deliver 200 grams of THC and pled guilty in the Wisconsin Circuit Court for Rock County to possession of THC.

32. ESQUIVIAS-SANDOVAL was charged in approximately 2001 with delivery of 133 grams of cocaine and found guilty by a jury in the Illinois Circuit Court for Winnebago County. He was sentenced on or about June 21, 2002, to fifteen years' imprisonment.

### D.  General Allegations

33. At the time of the events giving rise to this forfeiture action, ESQUIVIAS-SANDOVAL was a user of marijuana and cocaine, and his use of cocaine caused him financial difficulties.

34. At no time did members of the conspiracy discussed herein that gives rise to this forfeiture have authority from the federal government to distribute controlled substances.

### E.  December 6, 2021, Distribution of Methamphetamine and Cocaine

35. On December 6, 2021, an undercover agent (hereinafter the "UA") made arrangements to purchase a quarter pound of "ice" methamphetamine from ESCAMILLA and ESQUIVIAS-SANDOVAL.

36. When negotiating the purchase, the UA spoke to ESQUIVIAS-SANDOVAL by phone.

37. ESQUIVIAS-SANDOVAL informed the UA that they (ESCAMILLA and ESQUIVIAS-SANDOVAL) would meet the UA at a specific restaurant in Davenport, Iowa.

38. That evening, a black 2014 Acura arrived and parked next to the UA's vehicle at the restaurant.

39. The UA got into the Acura where ESQUIVIAS-SANDOVAL handed the UA 111.4 grams (approximately four ounces) of 100% pure methamphetamine (per laboratory testing) in exchange for $2,000.

40. ESQUIVIAS-SANDOVAL pulled out another bag containing approximately two ounces of cocaine and provided the UA an ounce of cocaine (in a bag weighing approximately 14.9 grams) in anticipation of future payment.

41. ESQUIVIAS-SANDOVAL further advised that he could sell "Perc 30" (M-30) pills to the UA for $4.00 per pill. These are blue counterfeit Percocet pills containing fentanyl stamped with "M" and "30."

42. Later that evening, the UA had contact with ESCAMILLA and ESQUIVIAS-SANDOVAL to arrange a meeting to discuss future narcotics transactions and to purchase the remaining cocaine that ESQUIVIAS-SANDOVAL had previously shown the UA.

43. ESQUIVIAS-SANDOVAL informed the UA to meet at the same restaurant in Davenport and, upon arrival, the UA found ESQUIVIAS-SANDOVAL and ESCAMILLA sitting at a table in the restaurant. The UA joined them.

44. During their conversation, ESQUIVIAS-SANDOVAL and ESCAMILLA advised the UA they wanted a local contact in the Quad Cities to whom they could supply narcotics, so they did not have to come to town as often.

45. The three discussed the prices for cocaine, methamphetamine, and M-30 fentanyl pills.

46. ESQUIVIAS-SANDOVAL and ESCAMILLA directed the UA to use code words when referring to different drugs including cocaine, methamphetamine, and M-30 fentanyl pills:

   a) "Golf balls" was code for powder cocaine,

   b) "Buttons" was code for M-30 Perc fentanyl pills, and

   c) "Water" was code for "ice" methamphetamine.

47. ESQUIVIAS-SANDOVAL informed the UA that they had an unlimited supply of cocaine, methamphetamine, and M-30 fentanyl pills and that they had fifty kilograms of cocaine they wanted to get rid of fast.

48. After discussing prices and quantities, ESQUIVIAS-SANDOVAL, ESCAMILLA, and the UA left the restaurant and walked to the black Acura.

49. At the vehicle, ESQUIVIAS-SANDOVAL took out a bag with approximately one ounce of cocaine from the glove compartment and provided it to the UA in anticipation of future payment. The bag weighed approximately 31.6 grams.

### F. January 13, 2022, Discussions

50. On January 13, 2022, the UA received a phone call from ESQUIVIAS-SANDOVAL who advised he would travel to the North Park Mall in Davenport, Iowa to sell the UA four ounces (or approximately 113.4 grams) of methamphetamine (using the code word "water" for methamphetamine) for $2,000.

51. ESQUIVIAS-SANDOVAL also had one to three ounces of cocaine and agreed to "front" one ounce (or approximately 28.35 grams) to the UA.

52. "Fronting" is when a drug dealer provides an illegal drug to someone in anticipation of being paid for it later.

53. The transaction did not occur due to conflicting schedules, but the UA agreed to meet with ESQUIVIAS-SANDOVAL the following week to purchase the four ounces of methamphetamine.

### G. January 18, 2022, Sale of Methamphetamine

54. On January 18, 2022, the UA made arrangements to purchase methamphetamine from ESCAMILLA and ESQUIVIAS-SANDOVAL.

55. The UA agreed to meet ESCAMILLA and ESQUIVIAS-SANDOVAL at a specific location in Rockford, Illinois.

56. After the UA arrived, the UA contacted ESCAMILLA and ESQUIVIAS-SANDOVAL via text message, to which they responded via text, "I'm finishing packing this for you, only 5 minutes."

57. Shortly thereafter, ESCAMILLA and ESQUIVIAS-SANDOVAL arrived and provided the UA with approximately 133 grams of crystal methamphetamine in

exchange for $2,000. ESQUIVIAS-SANDOVAL offered to hide the narcotics for the UA, and he agreed.

58.     ESCAMILLA and ESQUIVIAS-SANDOVAL told the UA to follow them to their garage located at a residence in Rockford.

59.     After they arrived at the residence, ESQUIVIAS-SANDOVAL hid the drugs in the air filter compartment of the UA's vehicle, after which the UA drove away.

### H.     January 25, 2022, Sale of Methamphetamine

60.     ESQUIVIAS-SANDOVAL text messaged the UA on January 23, 2022, to inquire if the UA was "ready for more." The UA informed ESQUIVIAS-SANDOVAL that he was "ready 4 more water." ESQUIVIAS-SANDOVAL advised that he would be in town on January 25, 2022.

61.     ESQUIVIAS-SANDOVAL and the UA agreed to meet at the same restaurant in Davenport, Iowa where they had met before.

62.     When ESCAMILLA and ESQUIVIAS-SANDOVAL arrived, they met with the UA.

63.     The UA paid ESCAMILLA $2,000, and ESQUIVIAS-SANDOVAL retrieved the 111.2 grams (or approximately four ounces) of 97% pure methamphetamine (confirmed by laboratory testing) from a concealed hiding spot under the hood of his car, a black Acura. The methamphetamine was vacuum-sealed, wrapped in duct tape, and weighed approximately 131.4 grams.

64. Following this transaction, the black Acura was stopped on Interstate 80.

65. During the stop, ESCAMILLA was identified through his Illinois driver's license. ESQUIVIAS-SANDOVAL was identified through a Jalisco (Mexico) driver's license he presented in the name of Luis Manuel Zamora Briseno.

66. Prior to this traffic stop, ESQUIVIAS-SANDOVAL was only known by investigators as "Junior" or "Luis."

I. **February 10, 2022, Sale of Methamphetamine and Fentanyl**

67. On February 9, 2022, the UA text messaged ESQUIVIAS-SANDOVAL and confirmed prior arrangements to get some "water" the next day.

68. ESCAMILLA text messaged the UA to meet at ESQUIVIAS-SANDOVAL's (and ESCAMILLA's) residence.

69. On February 10, 2022, the UA, along with surveillance officers, traveled to Rockford to conduct the transaction.

70. When the UA arrived, ESQUIVIAS-SANDOVAL was standing outside the detached garage and motioned the UA to drive and park inside the garage.

71. Once inside, ESQUIVIAS-SANDOVAL placed a clear, vacuum-sealed bag containing 223.32 grams (or approximately eight ounces) of 95% pure methamphetamine (confirmed by laboratory testing) in the air filter compartment of the engine of the UA's vehicle in exchange for $2,000 that day and $2,000 to be paid in the future, when the UA had the money.

72. The UA asked ESQUIVIAS-SANDOVAL for M-30 fentanyl pills, and ESQUIVIAS-SANDOVAL said a shipment of pills had just come in and agreed to sell some to the UA, but at a different house.

73. ESQUIVIAS-SANDOVAL got into the UA's vehicle and directed the UA to a residence in Machesney Park, Illinois.

74. ESQUIVIAS-SANDOVAL went inside the apartment building and returned with an orange plastic bag containing several thousand M-30 fentanyl pills.

75. ESQUIVIAS-SANDOVAL directed the UA to drive back to ESQUIVIAS-SANDOVAL's house.

76. Once at the house, ESQUIVIAS-SANDOVAL sold the UA fifty pills (approximately 6.4 grams of fentanyl) for $300.

### J. April 19, 2022, Sale of Methamphetamine

77. On April 17, or 18, 2022, ESQUIVIAS-SANDOVAL called the UA and said he would be driving to Davenport, Iowa to pick up $2,000 that the UA owed from the previous methamphetamine purchase.

78. On April 19, 2022, ESQUIVIAS-SANDOVAL met with the UA at the restaurant in Davenport, Iowa.

79. When the UA arrived, he observed ESQUIVIAS-SANDOVAL in a white Acura sedan.

80. ESQUIVIAS-SANDOVAL walked to the UA's vehicle and handed the UA a vacuum sealed bag of approximately four ounces of methamphetamine (which

weighed approximately 137 grams) through the driver's window and then got into the UA's vehicle.

81.     While in the vehicle, the UA paid ESQUIVIAS-SANDOVAL $2,000 for the prior drug debt.

82.     ESQUIVIAS-SANDOVAL told the UA to deal directly with him moving forward and informed the UA to purchase larger quantities of methamphetamine in the future, so that ESQUIVIAS-SANDOVAL did not need to travel to the Quad Cities as frequently.

83.     ESQUIVIAS-SANDOVAL said he had thirty-five ounces (approximately 992.23 grams) of "ice" for the UA to sell.

### K.     June 16, 2022, Arrest of Escamilla

84.     On June 16, 2022, law enforcement in California investigating a transnational criminal drug trafficking organization (DTO) based out of Mexico arrested ESCAMILLA and two other men with 9.1 kilograms (approximately 20.14 pounds) of cocaine located in a hidden compartment in their vehicle. They were expecting payment of $150,400 for the cocaine.

### L.     October 4, 2022, Sale of Cocaine

85.     On October 4, 2022, the UA contacted ESQUIVIAS-SANDOVAL via Snapchat.

86.     ESQUIVIAS-SANDOVAL advised the UA to meet him in Rockford, Illinois.

87. ESQUIVIAS-SANDOVAL arrived and advised the UA to follow him, and they traveled to ESQUIVIAS-SANDOVAL's residence in Rockford.

88. The pair went inside the residence and to the dining room, where the UA observed on the table a vacuum-sealed package containing about a half kilogram (500 grams) of powder cocaine and another half kilogram (500 grams) of cocaine on a glass cutting plate.

89. The UA paid ESQUIVIAS-SANDOVAL $2,000 for two ounces (approximately 56.7 grams) of cocaine, which ESQUIVIAS-SANDOVAL then cut from the cocaine on the glass cutting table, weighed it, vacuum-sealed it, and handed it to the UA.

**M.    October 25, 2022, Arrest of ESQUIVIAS-SANDOVAL**

90. On October 25, 2022, the UA contacted ESQUIVIAS-SANDOVAL to buy $24,000 worth of cocaine.

91. ESQUIVIAS-SANDOVAL said he would travel to Davenport, and it was agreed that they meet at the same restaurant where they had met previously.

92. At approximately 8:37 p.m. on October 25, 2022, ESQUIVIAS-SANDOVAL arrived at the restaurant in Davenport.

93. When ESQUIVIAS-SANDOVAL arrived, he was arrested.

94. Law enforcement recovered more than 500 grams of cocaine from the trunk of ESQUIVIAS-SANDOVAL's vehicle.

95. The gold necklace and pendant were seized from ESQUIVIAS-SANDOVAL at the time he was arrested.

### N. October 25, 2022, State Search Warrant

96. On October 25, 2022, after arresting ESQUIVIAS-SANDOVAL, law enforcement executed a state search warrant at his residence in Rockford and found a box containing six plastic bags with white powder (approximately 14.17 grams) and a spoon, a vacuum sealer, a money counter, two digital scales with white container with white powder residue, a black century safe with $23,045 in U.S. currency in one bedroom, $1,300 in currency in another bedroom, and $143 in a wallet.

97. A total of $24,488 was seized.

98. The $23,045 in the safe consisted of 79 $100 bills, 12 $50 bills, 725 $20 bills, 1 $10 bill, 2 $5 bills, 5 $2 bills, and 15 $1 bills.

99. The $143 seized from a wallet in the bedroom consisted of 1 $50 bill, 3 $20 bills, 5 $5 bills, and 8 $1 bills.

100. The $1,300 seized from a black bag under the bed in the bedroom consisted of 13 $100 bills.

101. On November 4, 2022, a properly trained drug detection dog conducted free air tests to determine if the seized currency was associated with, and contaminated by, illegal controlled substances.

102. The properly trained drug detection dog alerted positively to the odor of controlled substances on each of the four tests conducted on the seized currency.

### O. The Federal Conspiracy Prosecution

103. On November 9, 2022, ESCAMILLA and ESQUIVIAS-SANDOVAL were indicted in the Southern District of Iowa on charges of conspiracy to distribute

50 grams or more of methamphetamine and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, 5 kilograms and more of a mixture or substance containing a detectible amount of cocaine, and 40 grams or more of a mixture or substance containing a detectable amount of fentanyl. ESQUIVIAS-SANDOVAL was also charged with five counts of distribution of, or possession with the intent to distribute, controlled substances, and illegal reentry into the United States after having been deported or removed to his native country of Mexico. ESCAMILLA was also charged with three distribution counts. *United States v. Escamilla, et al.*, No. 3:22-cr-114 (S.D. Iowa Nov. 9, 2022) (R. Doc. 18).

104. The charges in the criminal case parallel the allegations in this matter.

105. On August 21, 2023, ESQUIVIAS-SANDOVAL pled guilty to the conspiracy and illegal reentry charges.

106. On July 24, 2024, ESCAMILLA pled guilty to the conspiracy charge.

107. ESQUIVIAS-SANDOVAL was sentenced on March 27, 2024, to 158 months in federal prison. He appealed his sentence, and it was affirmed by the U.S. Court of Appeals for the Eight Circuit on December 23, 2024.

108. ESCAMILLA was sentenced on December 16, 2024, to sixty months in federal prison.

### P. Attempted Administrative Forfeiture

109. The FBI attempted an administrative forfeiture of the Defendant Property, which was contested by ESQUIVIAS-SANDOVAL on or about August 27, 2025.

110.	In his administrative claim, ESQUIVIAS-SANDOVAL asserted his mother purchased the gold necklace and pendant for him in 1993 from a store in Rockford, Illinois. In support of his claim, he provided a photo he claimed was of himself wearing the necklace and pendant in 1998.

111.	ESQUIVIAS-SANDOVAL is believed to have been associated with illegal drug trafficking, as a customer and/or dealer, since he was in his early teens, in approximately 1993–1994, involving marijuana and cocaine.

112.	ESQUIVIAS-SANDOVAL claimed his mother loaned him the $24,488 in cash, which he stored in a safety box, and was to be used to allegedly help him out "for things such as bills, purchase a new vehicle, etc."

113.	ESQUIVIAS-SANDOVAL 's mother, Aurora Esquivias-Sandoval, who is in her 70s, is believed to be a homemaker, with no outside income.

114.	Plaintiff believes evidence will show, after it conducts discovery in this case, including but not limited to acquiring income and bank records from Aurora Esquivias-Sandoval and taking her deposition under oath, that she made no such loan to ESQUIVIAS-SANDOVAL.

115.	On October 5, 2025, ESQUIVIAS-SANDOVAL forwarded to the FBI a letter from his mother, in which she states she gifted her son with "a necklace with a pendant when he was younger" that was seized from him at the time of his arrest. The letter did not identify a date when the necklace with a pendant was alleged given, nor did it discuss the $24,488 in U.S. currency seized from her son.

## VI. COUNT ONE
## FORFEITURE UNDER 21 U.S.C. § 881(a)(6)

116. Plaintiff repeats and realleges each and every allegation set forth above.

117. Plaintiff believes the Defendant Property constitutes money or other things of value furnished or intended to be furnished in exchange for a controlled substance, and/or used or intended to be used to facilitate one or more violations of the Controlled Substances Act, including, but not limited to, 21 U.S.C. §§ 841 843, and 846.

118. As a result of the foregoing, the Defendant Property is forfeitable to the United States in accordance with 21 U.S.C. § 881(a)(6).

## VII. CONCLUSION

WHEREFORE, Plaintiff requests the foregoing property be civilly forfeited and such other relief to which it is entitled under applicable law.

Respectfully Submitted,

David C. Waterman
United States Attorney

By: */s/ Craig Peyton Gaumer*
Craig Peyton Gaumer
Assistant United States Attorney
U.S. Attorney's Office
210 Walnut Street, Suite 455
Des Moines, IA 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, David Brown, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation (FBI), that I have read the foregoing Verified Complaint, and that I know the contents thereof are true to my own knowledge, except for those matters not within my own personal knowledge, and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent.

Dated: 11/26/2025

_____
David Brown, Special Agent
FBI